**SO ORDERED.**

**SIGNED this 08 day of November, 2010.**

_____
**Randy D. Doub**
**United States Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:

| | |
|---|---|
| **THE NORTHERN OUTER BANKS** | **CHAPTER 11** |
| **ASSOCIATES, LLC,** | **CASE NO. 10-01292-8-RDD** |

   **DEBTOR**

### ORDER DENYING CONFIRMATION OF
### CHAPTER 11 PLAN OF REORGANIZATION

   Pending before the Court is the Chapter 11 Plan of Reorganization filed on May 20, 2010 (the "Plan") by The Northern Outer Banks Associates, LLC (the "Debtor"), the Objection to the Chapter 11 Plan of Reorganization filed on July 15, 2010, by Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association ("Wells Fargo"), (the "Objection") and the Bankruptcy Administrator's Response to Debtor's Plan of Reorganization filed on July 15, 2010 (the "Response"). The Court conducted a hearing on the Plan, the Objection, and the Response on September 30, 2010 in New Bern, North Carolina and continued that hearing on October 7, 2010 in Wilson, North Carolina.

## BACKGROUND

On February 19, 2010, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is a North Carolina limited liability company and owns real estate consisting of approximately 5.35 acres of undeveloped property located at 6195 Croatan Highway, Southern Shores, North Carolina (the "Real Property").

Wells Fargo is the holder of a promissory note in the principal amount of two million two hundred fifty thousand dollars ($2,250,000.00) executed on January 23, 2007 by both the Debtor and Bruce S. Pollak ("Mr. Pollak"), a managing member of the Debtor (the "Note"). As of the petition date, the balance due under the terms of the Note was two million one hundred one thousand five hundred eight dollars and seventy one cents ($2,101,508.71), exclusive of attorneys' fees and costs. The parties do not dispute that the Note is in default.

In addition to executing the Note, the Debtor and Mr. Pollak executed a Deed of Trust granting Wells Fargo a first priority lien against the Real Property based on the indebtedness described in the Note.

Based on the arguments of counsel and the evidence presented to the Court at the hearings, confirmation of the proposed Plan is **DENIED** for the reasons set forth herein.

## I. FAILURE TO COMPLY WITH APPLICABLE PROVISIONS OF THIS TITLE

Section 1129(a)(1) provides that a court shall confirm a debtor's plan of reorganization only if the plan complies with the applicable provisions of this title. 11 U.S.C. § 1129(a)(1). Section 1129(a)(10) requires that at least one impaired class vote to accept the plan without regard to the vote of any insider. Although the Debtor argues that it has an impaired class that voted in favor of the Plan, a closer look at the members of that class reveal that two creditors voting in that class were,

2

in fact, insiders, as defined in the Bankruptcy Code. Therefore, the Plan proposed by the Debtor does not comply with § 1129(a)(10).

The term "insider," as it relates to corporate debtors, is defined in § 101(31)(B) of the Bankruptcy Code:

> (31) The term "insider" includes-
>
> > (B) if the debtor is a corporation-
> >
> > > (i) director of the debtor;
> > >
> > > (ii) officer of the debtor;
> > >
> > > (iii) person in control of the debtor;
> > >
> > > (iv) partnership in which the debtor is a general partner;
> > >
> > > (v) general partner of the debtor; or
> > >
> > > (vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).

Determining whether an entity is an insider is a question of fact, which must be determined on a case-by-case basis. *See In re Broumas*, Nos. 97-1183 & 97-1182, 1998 WL 77842, at *7 (4th Cir. 1998) (citing *Browning Interests v. Allison*, 955 F.2d 1008, 1011 (5th Cir. 1992)). Excluding insiders from impaired classes who vote on the reorganization plan stems primarily from the desire to protect the interests of other creditors. *In re Gilbert*, 104 B.R. 206, 210 (Bankr. W.D. Mo. 1989). The concern is to "forestall the voting of a creditor who is so beholden to or controlled by the debtor as to in effect be an alter ego of the debtor." *Id.* at 210.

3

The definition of insider is "illustrative rather than exhaustive." *Longview Aluminum, L.L.C. v. Brandt*, 431 B.R. 193, 196 (N.D. Ill. 2010) (citing *In re Krehl*, 86 F.3d 737, 741-42 (7th Cir. 1996)). Section 101(31)(B) uses the word "includes."  The use of such a term does not connote that the examples listed are exclusive.  Courts have held that "in addition to the individuals and entities actually named, the term also encompasses anyone with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'" *Id.*  (citing *In re Krehl*, 86 F.3d 737, 741-42 (7th Cir. 1996)).

"[I]nsider analysis invites the Court to consider whether the disputed relationship is similar to or bears characteristics of any of the relationships specified in the statute." *In re Gilbert*, 104 B.R. at 210 (citing *In re Henderson*, 96 B.R. 820, 825 (Bankr. E.D. Tenn. 1989)).  Courts have held that the Bankruptcy Code's definition of "corporation" as defined in § 101(9) includes the limited liability company.[1]  "[L]imited liability companies and similar entities . . . fall under the definition of a corporation in the Bankruptcy Code § 101." *See* Fed R. Bankr. P. 7007.1 Advisory Committee Note (2009).

Section 101(31) does not directly define an insider in the context of a limited liability company.  However, case law provides guidance for determining whether a member of a debtor limited liability company can be considered an insider, as defined in § 101(31)(B).  In *Longview*

---

[1]A limited liability company ("LLC") "is owned by members who have the same protection from liability as shareholders of a corporation.  Thus, although the members of an LLC are in some respects similar to partners in a partnership, they are not general partners.  Even if they were partners, their protection from liability would render the entity the type of partnership association falling within subsection (A)(ii), thus making the limited liability company fall within the Code's definition of "corporation." 2 COLLIER ON BANKRUPTCY ¶ 101.09 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2009) (citing *Broyhill v. DeLuca*, 194 B.R. 65, 74 (Bankr. E.D. Va. 1996); *In re ICLNS Notes Acquisition, L.L.C.*, 259 B.R. 289 (Bankr. N.D. Ohio 2001)).

*Aluminum, L.L.C. v. Brandt*, the District Court for the Northern District of Illinois addressed the issue of whether a managing member of an limited liability company qualified as an insider as defined in 11 U.S.C. § 101(31) for the purpose of setting aside preferential transfers. 431 B.R. 193 (N.D. Ill. 2010).   Longview's limited liability company agreement listed five members who made up the board of managers. *Id.* at 194. The managing members had the right to inspect, audit, check and make copies of the company's books and records.  *Id.* at 195.  Longview made prepetition payments to one of its managing members during the one year prior to the filing of the petition for relief.  The court found that the managing member who received the funds was an insider for purposes of 11 U.S.C. § 101(31), and that the trustee could avoid and recover the prepetition payments.  In making its determination, the court addressed the issue of whether a member of a limited liability company can be properly analogized to a "director" of a corporation.  The court found that the term "director" in § 101(31)(B) "is merely intended to illustrate the underlying relationship between the individual and the company." *Id.* at 196.  The court noted that the limited liability company agreement, provided its members with authority, power and responsibility to manage the operations and affairs of the limited liability company.  *Id.* at 197.  The managing member's position as one of the five members of the limited liability company was a "position equivalent to a director's position." *Id.* at 196.  Therefore, a managing member of a limited liability company can be analogized to a director of a corporation under § 101(31) when the member possesses authority, power and responsibility  for managing the limited liability company.  *Id.* at 197.

In this case, the Debtor is a limited liability company as opposed to a corporation. The Debtor was formed in 2003 and is engaged in the business of owning and developing real estate.

Mr. Pollak testified the Debtor is governed by a Limited Liability Company Agreement ("LLC Agreement") and four individuals are members. According to the voluntary petition filed by the Debtor and the testimony presented to the Court, Mr. Pollak is a *managing* member with a fifty-eight percent (58%) equity interest. Neal Blinken ("Mr. Blinken") is also a *managing* member with a twenty-two percent (22%) equity interest. Craig Difeo is a member with a ten percent (10%) equity interest and Gary St. Jean is the fourth member, who also holds a ten percent (10%) equity interest.

Class 6 of the proposed Plan is comprised of general unsecured creditors. The Debtor asserts that this class is impaired. Class 6 includes a one hundred fifty thousand dollar ($150,000.00) claim asserted by Mr. Pollak, a three hundred fifty thousand dollar ($350,000.00) claim held by Southern Coastal Associates of Dare County, Incorporated ("SCA"), a twelve thousand five hundred dollar ($12,500.00) claim alleged by McKim & Creed, P.A.,[2] and a two hundred one thousand five hundred eight dollar and seventy-one cent ($201,508.71) claim held by Wells Fargo.[3] Both Mr.

---

[2]On the Amended Summary of the Ballots as submitted by the Debtor on September 29, 2010, McKim & Creed, P.A. is listed as having a secured claim consisting of a judgment lien that is secured by the Real Property and stems from a 2008 state court case. Because this lien attached subsequent to the recordation of Wells Fargo's Deed of Trust, there is no equity or value in the Real Property to support the judgment lien as the Court has valued the Real Property at $1,900,000.00. *See* Order For Valuation of Collateral docketed in conjunction with this Order. Therefore, the claim will be treated as unsecured. As further support that this claim is unsecured, McKim & Creed P.A. listed its claim of twelve thousand five hundred dollars ($12,500.00) as unsecured on the proof of claim filed in this proceeding.

[3] On the Amended Summary of the Ballots as submitted by the Debtor on September 29, 2010, Wells Fargo is listed as having an unsecured claim in the amount of one hundred ninety one thousand five hundred eight dollars and seventy-one cents ($191,508.71) and a secured claim in the amount of one million nine hundred ten thousand dollars ($1,910,000.00). However, because the Court finds that the Real Property is valued at one million nine hundred thousand dollars ($1,900,000.00), the unsecured claim must be increased by ten thousand dollars ($10,000.00) to adjust for the lower property value set by this Court. Therefore, this ten thousand dollars ($10,000.00) should be added to the initial unsecured claim of one hundred ninety one thousand five hundred eight dollars and seventy-one cents ($191,508.71) giving Wells Fargo a total

Pollak and McKim & Creed, P.A. cast ballots accepting the Plan. Wells Fargo filed a ballot rejecting its treatment under the Plan. Mr. Blinken, who is also a managing member of the Debtor, signed the ballot on behalf of SCA as accepting the Plan. Based on the acceptances received, the Debtor argues that it has the requisite accepting votes, both in amount and number, of an impaired class of claims that would permit confirmation. The Court disagrees.

11 U.S.C. § 1126(c) states that "a class of claims has accepted a plan if such plan has been accepted by creditors, . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors."

As previously addressed, Mr. Pollak is a *managing* member of the Debtor, a limited liability company. Mr. Pollak is the active manager of the Debtor. Unlike the other members of the Debtor, he took on substantial responsibility and control in managing the operations and affairs of the Debtor. Both the Debtor and Mr. Pollak executed the Note establishing the indebtedness to Wells Fargo in 2007. Mr. Pollak is a fifty-eight percent (58%) equity interest holder in the Debtor. Additionally, Mr. Pollak has signed on behalf of the Debtor countless times, and was the only member of the Debtor to testify during the hearings. Mr. Pollak also signed the voluntary petition filed with this Court. His position as a managing member of the Debtor, makes his conduct subject to closer scrutiny by this Court. Based on his close relationship with the Debtor, his management role in the Debtor's operations, and his ownership in the Debtor, Mr. Pollak is clearly an "insider" under § 101(31).

---

unsecured claim of two hundred one thousand five hundred eight dollars and seventy-one cents ($201,508.71).

Similarly, the facts support this Court's holding that the SCA unsecured claim is an "insider" claim. SCA is an administratively dissolved corporation. Mr. Blinken is president of SCA and is also a managing member of the Debtor with direct influence over the Debtor's operations. Although Mr. Blinken is not directly making a claim against the Debtor, one of the corporations in which he controls, SCA, has voted in favor of the Plan. Mr. Blinken, unlike the other members of the Debtor is the principal of SCA. Property owned by SCA is adjacent to the property owned by the Debtor. SCA developed the adjacent septic plant which aided the Debtor to obtain permits.

SCA was administratively dissolved in 2004. However, Mr. Pollak testified that SCA was the original contracting party to purchase the Real Property. SCA later assigned the Real Property to the Debtor for one dollar ($1.00). The Debtor made a deal with SCA, "that if the Debtor developed the property and the property made money, SCA would get a portion of the profits." *See* testimony of Bruce Pollak.

Based on the function of SCA in the Debtor's operations, its involvement with the Debtor, Mr. Blinken's status as the president of SCA, and his position as one of the managing members of the Debtor, the Court finds that SCA is an insider for purposes of § 1129(a)(10).

Given the insider status of these two (2) Class 6 creditors who voted in favor of the Plan, the Debtor fails to meet the threshhold requirement of Section 1126 (c). More specifically, the Court finds that Mr. Pollak and SCA are both "insiders" under § 101(31) of the Bankruptcy Code, and therefore, both claims will not be considered in the Section 1126(c) ballot computation. The exclusion of either the claim of Mr. Pollak or the claim of SCA results in less than two-thirds (2/3rds) acceptance in amount by Class 6. Therefore, the Debtor does not satisfy the requirements of 11 U.S.C. § 1126(c) and § 1129(a)(10).

8

In addition, Wells Fargo questioned whether SCA, as an administratively dissolved corporation, had the ability and authority to submit a ballot in favor of the Plan and whether or not Mr. Pollak and SCA timely submitted their ballots.  Having previously determined that the ballots of SCA and Mr. Pollak are disallowed on "insider" grounds, the Court need not consider these issues.

## II.  FEASIBILITY OF THE AMENDED PLAN

Section 1129(a)(11) of the Bankruptcy Code requires that in order for a plan to be confirmable, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  This requirement is often called the feasibility requirement.  *In re A.H. Robins, Co., Inc.* 880 F.2d 694, 698 (4th Cir. 1989).  The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence.  *In re Investment Co. Of Southwest, Inc.  (F.H. Partners, L.P. v. Investment Co. of Southwest, Inc., Four Hills Associates, and Bank of America)*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006).  Feasibility is "firmly rooted in predictions based on objective fact."  *In re Cheatham*, 78 B.R. 104, 109 (Bankr. E.D.N.C. 1987); *In re Investment*, 341 B.R. at 310.

*In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp.*, the Bankruptcy Court for the Middle District of North Carolina set forth factors a court may consider in assessing feasibility. 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995).  These factors include "the capital structure of the reorganized [d]ebtors, their projected earning power, economic conditions, management's ability and likelihood of continuing to work for the reorganized [d]ebtors, and any other factors

9

relevant to the performance of the [p]lan." *Id.* (citing *In re Polytherm Industries, Inc.*, 33 Bankr. 823 (W.D. Wis. 1983)).

Debtor's Plan proposes to treat Wells Fargo's claim as a secured obligation and proposes to retain and market the Real Property for sale for an eighteen (18) month period. Debtor's Plan does not provide for payments of any kind to creditors throughout this period. During the eighteen (18) month marketing period interest shall accrue at the rate of three and one-half percent (3.5%)[4]. At the end of the eighteen (18) month period, if the Real Property has not sold, the Debtor proposes to create a term loan in favor of Wells Fargo consisting of all principal and interest due to Wells Fargo payable in equal monthly installments of principal and interest under a twenty (20) year amortization schedule with a five (5) year call.

The Court holds that the Plan is not feasible within the meaning of § 1129(a)(11). First, the Debtor has been unwilling or unable to make monthly interest payments to Wells Fargo on a consistent basis, and has failed to present any evidence that the Debtor or its principals are able or willing to infuse capital to improve the Real Property, capitalize the Debtor to support a feasible Plan, or assume any risks associated with the extended marketing period. Since the filing of this case, the Debtor has had difficulty satisfying its financial obligations. Although the Debtor did make a payment of interest to Wells Fargo on the ninetieth (90th) day following the filing of the Petition, the Debtor has failed to make any additional interest or principal payments to Wells Fargo since that time. In addition to Debtor's failure to make monthly interest payments to Wells Fargo on a consistent basis, Debtor also failed to pay the 2009 ad valorem taxes. Mr. Pollak testified that the

---

[4]Debtor's proposed Plan stated an interest rate of "three and one-half percent (3.25%) per annum." During the hearing, counsel cleared up this inconsistency, stating the correct interest rate was three and one-half percent (3.5%) per annum.

only asset of the Debtor is the Real Property, and therefore, the Debtor has no assets from which to pay the ad valorem taxes.

Furthermore, the Court notes that throughout Mr. Pollak's testimony, he was asked several times whether any of the managing members of the Debtor had the ability to, would consider, or were willing to infuse capital into the Debtor in order to make the Plan more feasible. Mr. Pollak finally responded by stating that his opinion was that the other members did not have the ability to infuse capital into the Debtor, and even if they did have the ability, they were not willing to do so. Mr. Pollak further testified that there is a clause in the operating documents of the Debtor that allows it to request capital contributions from the members. However, there is no provision in those documents which would allow for the enforcement of such clause. Mr. Pollak testified that he was personally willing to contribute between fifteen thousand dollars ($15,000.00) to twenty-five thousand dollars ($25,000.00) for the purpose of marketing the Real Property. However, this proposed contribution is neither disclosed in the proposed Plan nor Disclosure Statement that is before the Court.

The Plan places all risks associated with non-payment and a continued declining real estate market on Wells Fargo. Ms. Kee Marshall, a senior vice president with Wells Fargo, ("Ms. Marshall"), has worked with special asset groups for the past eleven (11) years. She testified at the hearing on October 7, 2010. Ms. Marshall stated that throughout her career she has never seen a forbearance agreement with such terms as the Debtor proposed in its Plan. More specifically, she stated that the bank would bear all the risk of the eighteen (18) month marketing period as the Debtor would not be required to make any payments and the interest would continue to accrue.

11

In addition, if the Real Property has not sold at the end of the marketing period, the Debtor requests that Wells Fargo be required to amortize the total amount due under the Note, including all principal and interest, over twenty (20) years with a five (5) year call.  The Debtor proposes to make monthly payments based on the twenty (20) year amortization schedule during the five (5) year period, subsequent to the year and a half marketing period.  Ms. Marshall stated that the risk is high of missed payments or other defaults. By being required to sit and wait for a year and half and then reamortizing the principal and interest for yet another twenty (20) years, Wells Fargo is assuming all the risks involved, including such risks as nonpayment, continued decline in the value of the Real Property, further downturns in the real estate market and economy, while the Debtor has nothing at risk during the eighteen (18) month marketing period.

Ms. Marshall testified that there is no current market for financial arrangements of the type proposed by the Debtor.  If the Debtor wanted a loan in today's market, most banks would expect a double digit interest rate as opposed to a three and a half percent (3.5%) rate as proposed by the Debtor.  Furthermore, Ms. Marshall testified that the loan documents require the Debtor to submit updated financial information on a regular basis.  However, after numerous attempts to obtain this updated information from the Debtor, the Debtor has refused to provide such information.  Without this information, Wells Fargo is unable to determine whether the Debtor or its principals have any financial ability to make the proposed Plan more feasible.

Debtor presented no evidence that it either has the ability to generate funds or obtain a capital infusion from investors or its members, or to make payments to Wells Fargo. The lack of capital funding or payments places all the risks of nonpayment on Wells Fargo.

12

Second, Debtor's proposed Plan is speculative in regards to how and when payments will be made to creditors. The Plan proposes to retain and market the property for an eighteen (18) month period. During this marketing period, the Plan does not provide for any payments to creditors and does not propose the payment of ad valorem taxes. In addition, the Plan does not require payments to unsecured creditors until the Real Property is sold at some point in the future. The Debtor addresses the lack of sale contingency by requiring Wells Fargo to reamortize its loan and accept monthly payments based on the reamortization schedule. However, the Debtor failed to present any evidence on how it would generate funds to pay the monthly payments to Wells Fargo after the eighteen (18) month marketing period. Mr. Pollak even testified that the only asset of the Debtor is the Real Property and the only means of repaying the creditors is through the sale of said property.

Both the appraiser for the Debtor and the appraiser for Wells Fargo testified that very few tracts of undeveloped land have sold in the past two (2) years in Dare County, and that the probability of the Debtor finding a purchaser during the eighteen (18) month marketing period is highly unlikely. Since a sale is unlikely, presumably, the Debtor will need to commence monthly payments after the marketing period. However, the Debtor failed to provide the Court with evidence of how and when any payments will be made to creditors.

Third, the Real Property has been on the market since 2004 and has failed to produce a buyer or generate any income. Because of zoning restrictions and the current economic climate, future use of the Real Property is limited. At the present time, the Debtor has obtained approval for a thirty-six (36) unit condominium project but no improvements have been made on the Real Property. Mr. Pollak testified that the Real Property is currently in the same physical condition as it was on July

21, 2003, when the Debtor purchased it.[5]  Of the 5.35 acre site, 4.55 acres are uplands and 0.80 acres are wetlands.  About 0.80 acres of uplands is situated within a North Carolina power line easement which runs along the road frontage.  The Real Property will share a waste water treatment plant with a patio home development to its east.  However, in order to obtain a working sewer access, the Debtor or a future purchaser would need to install sewer infrastructure.  The Debtor failed to present any evidence of a plan to provide infrastructure for the raw land or any funds available to improve or develop the property.

Furthermore, Wells Fargo's appraiser[6] valued the property at one million nine hundred ten thousand dollars ($1,910,000.00).  He testified that in today's economic climate, a twenty-four (24) to thirty-six (36) month marketing period would be required to sell the property as a residential development tract at this price.  In order for the Debtor to sell the Real Property in less than twelve (12) months, he believes a considerable price discount would be required.  This Court has determined the value of the property to be one million nine hundred thousand dollars ($1,900,000.00).[7]  In recent years, the demand for residential condominiums has dramatically decreased.  Mr. Bourne testified that it would take nine (9) years to sell all of the thirty-six (36) residential condominium units.  Based on the current market, there is 2.37 years of existing inventory of condominiums for sale within the market area of the Debtor's property.

_____

[5]Mr. Pollak testified that bulkheading was added along the shoreline as an improvement by the Debtor.

[6]Gregory Bourne ("Mr. Bourne") testified on behalf of Wells Fargo.  Mr. Bourne is certified by the Member Appraisal Institute ("MAI") and is a state certified real estate appraiser with twenty-three (23) years of experience.

[7]*See* Order on Motion of Valuation of Property docketed in conjunction with this Order.

Based on the testimony presented to the Court, the Debtor's ability to sell the property within the eighteen (18) month marketing period proposed by the Plan is speculative. Just ten (10) months ago, the list price of the Real Property was four million two hundred thousand dollars ($4,200,000.00). The price has since been reduced to three million two hundred thousand dollars ($3,200,000.00). Even at this reduced price, it is speculative as to whether any purchasers would be willing to step into such a situation in today's volatile economy and real estate market or if purchasers would even be able to obtain financing. The Debtor's appraisal was two million eight hundred thousand dollars ($2,800,000.00), yet the Debtor still continues to market the Real Property at three million two hundred thousand dollars ($3,200,000.00). To continue marketing the Real Property at a list price of four hundred thousand dollars ($400,000.00) above its own appraised value raises not only feasibility questions, but also questions of good faith.

As noted, zoning restrictions limit the future use of the Real Property. At the present time, the property is zoned C - Commercial District, which permits offices, retail stores, financial institutions, service uses, restaurants, single family dwellings, duplexes, multifamily dwellings, large home dwellings and associated uses, as defined by the RS-8 Multi-Family Residential District. The Debtor's proposed thirty-six (36) unit residential condominium project has all governmental approvals in place. To permit this land for any other sort of development, such as a restaurant, hotel, etc., would require the development of a new site plan, additional expenses and costs, as well as the risk that such development would not be approved by the requisite government agencies.

The Debtor's appraiser suggested the best use of the Real Property would be a restaurant. However, based upon the statistics and the data presented throughout the hearing, this is not a commercially reasonable proposal for this Real Property. New permits would be required if a

15

purchaser was interested in building a restaurant.  However, Mr. Bourne testified the Real Property does not have access to a stoplight.  The traffic gridlocks at this particular location, would probably result in access difficulties for a restaurant.  Such traffic flow problems would hinder the approval process or deter potential purchasers.

Therefore, based on the reasons set forth above, the Debtor has failed to satisfy its burden that its Plan is, in fact, feasible.  It is likely that this Plan would be followed by liquidation or the need for further financial reorganization. The Plan fails to satisfy the feasibility requirement of § 1129(a)(11).

### III.  TREATMENT OF WELLS FARGO IS NOT FAIR AND EQUITABLE

Had at least one class of impaired claims accepted the proposed Plan, the proposed Plan could be confirmed over Wells Fargo's objections under  11 U.S.C. § 1129(b)(1).  A proposed plan must be "fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(2) sets forth the standards a plan must meet to be considered "fair and equitable."  However, these requirements are not exclusive.  Even if a plan meets the standards of 11 U.S.C. § 1129(b)(2), it can still be considered not "fair and equitable" and, therefore, nonconfirmable.  *In re EFH Grove Tower Associates*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (citing *In re Matter of D&F Construction Co.*, 865 F.2d 673, 675 (5th Cir. 1989); *In re Cheatham*, 78 B.R. 104 (Bankr. E.D.N.C. 1987), *aff'd* 91 B.R. 377 (E.D.N.C. 1988)).  For a plan to be "fair and equitable," the plan must literally be fair and equitable.

While a Chapter 11 reorganization gives debtors the opportunity to restructure their financial relationships with creditors, the Debtor's proposed Plan is not fair and equitable in that it requires a lengthy period of negative amortization and no payments during the eighteen (18) month

16

marketing period.  The long negative amortization period, the unwillingness on behalf of the managing members of the Debtor to infuse capital into the Debtor, the lengthy marketing period and the unbalanced risks placed on Wells Fargo including nonpayment, further decline in the value of the property, accumulating interest and the proposed three and a half percent (3.5%) interest rate that is below the commercial market rate for a loan of this type, combine to make this proposed Plan treatment of Wells Fargo not fair and equitable.

Whether negative amortization in a Chapter 11 plan is "fair and equitable" should "be determined on a case-by-case basis." *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1178 (9th Cir. 1992).  Negative amortization is not "per-se" inequitable.  *In re Club Assocs.*, 107 B.R. 385, 398 (1989).  However, "negative amortization is highly suspect" when evaluating whether the plan is "fair and equitable" under  11 U.S.C. § 1129(b)(1).  *Id.* (citing *In re Anderson Oaks Ltd. Partnership,* 77 B.R. 108 (Bankr. W.D. Tex. 1987); *In re Century Investment Fund VII Ltd. Partnership*, 96 B.R. 884 (Bankr. E.D. Wis. 1989)).

Many courts, including the Ninth Circuit, have adopted a ten factor test to determine whether a plan with negative amortization is fair and equitable.  *In re Apple Tree Partners, L.P.* 131 B.R. 380, 398 (1991)*; Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1178 (9th Cir. 1992); *In re Windwood Heights, Inc.*, 385 B.R. 832, 840 (Bankr. N.D. W.VA. 2008) (applying the ten factor test to a plan proposing negative amortization); *In re Consolidation Properties Ltd. Partnership*, 170 B.R. 93, 99 (Bankr. D. Md. 1995) (relying on the ten factor test, and noting that "only where it is clear that a negative amortization plan does not unduly shift the risk of loss to the creditor, should the Court find that it is fair and equitable"); *In re Oaks Partners, Ltd.*, 141 B.R. 453, 456 (Bankr. N.D. Ga. 1992) (applying the ten factor test to a plan proposing negative amortization).

17

Based on the cases cited, the ten factors which should be considered to determine whether a negative amortization plan is fair and equitable include: (1) whether the plan offers a market rate of interest and the present value of the deferred payments; (2) whether the amount and length of the proposed deferral is reasonable; (3) whether there is a sufficient equity cushion; (4) whether the plan is feasible; (5) whether the collateral is appreciating, depreciating or stable; (6) whether the risks involved are unduly shifted to the creditor; (7) whether the risks are borne by one secured creditor or a class of secured creditors; (8) whether the plan precludes secured creditors from foreclosure; (9) whether the original loan terms provide for negative amortization; (10) whether there are adequate safeguards to protect the secured creditor against plan failure. *Sierra Woods Group*, 953 F.2d at 1178.

More recently, the United States Bankruptcy Court for the Eastern District for North Carolina addressed deferred interest payments and negative amortization in *In re Carolina Commons Dev., LP*, No. 09-011230-8-JRL, 2010 WL 1965895, at *2 (Bankr. E.D.N.C. May 17, 2010). The court, while addressing the issue of whether to grant relief from the automatic stay under § 362(d)(3), noted that a debtor's plan "which defer[s] all interest for three years, during which time the debtor cannot default under the plan and is not obligated to sell the collateral but is entitled to keep 30% of any sale proceeds" is commercially unreasonable. *Id.* The court found that such a plan "bears no resemblance to current commercial market conditions."*Id.*

In addition, *In re EFH Grove Tower Associates*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989), the United States Bankruptcy Court for the Eastern District of North Carolina, found that a plan which imposes substantial risks upon a creditor is not "fair and equitable" under 11 U.S.C. § 1129(b)(1). The debtor's plan precluded the creditor from exercising its right to foreclose on its

defaulted mortgage yet sought to impose a payment moratorium lasting approximately two years. *Id.* at 313. When the installment payments would commence, the amount proposed was insufficient to reduce the actual debt owed. *Id.* In that case the debtor argued the plan would allow the debtor time to make improvements to the building, thus enhancing the value of the creditor's collateral. This would occur because during the period of the payment moratorium, a general partner of the debtor was to loan the debtor funds for the purpose of improving the building and paying off the first mortgage. *Id.* at 314. The court found that the creditor bore the risk of realizing only the liquidation value of the property if the property did not appreciate during the payment moratorium period. *Id.* The court noted that the plan provided the debtor and the debtor's general partners with significant benefits, but only required them to accept minimal risks. *Id.* at 313. Further, the court noted the "costs of the debtor's reorganization should be borne by those who stand to gain from the reorganization." *Id.* at 314. Based on this reasoning, the court denied confirmation noting that the "debtor would have presented a stronger case if it had been willing to assume more of the risk." *Id.* at 314-15.

The Court has valued the property at one million nine hundred thousand dollars ($1,900,000.00) and the total outstanding balance of principal and interest as of the date of the Petition owed to Wells Fargo was two million one hundred one thousand five hundred eight dollars and seventy one cents ($2,101,508.71.) There is no equity cushion in the Real Property. The Plan does not propose for the Debtor to make payments of any kind to Wells Fargo during the eighteen (18) month negative amortization period, and only proposes that interest accrue at three and one half percent (3.5%) per annum. Additionally, if the Debtor has not sold the property within the eighteen (18) month period, the Debtor proposes to amortize the remaining principal balance of the debt at the

same interest rate of three and one half percent (3.5%) with a twenty-year (20) amortization and a five-year (5) call.

No evidence was offered of the Debtor's ability to make payments after the eighteen (18) month period. The Real Property is an undeveloped lot whose value has drastically declined in the last several years. In the current economic climate, a sale of the Real Property is highly speculative. Wells Fargo would be assuming all associated risks of failure. The Plan precludes Wells Fargo from foreclosing during the first eighteen (18) months and requires it to accept a negative amortization, which was not part of the original loan terms. Nowhere in the Plan are there adequate safeguards to protect the secured creditor's interest. In the Debtor's proposal, it just wants to sit back and stall, all the while expecting Wells Fargo to carry the debt without any payments and expose itself to further market declines. Considering the factors articulated in *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1178 (9th Cir. 1992), and the aforementioned case law, the Court finds that the Debtor's proposed treatment of Wells Fargo's claim is not fair and equitable.

Furthermore, this Plan is similar to the situation in *In re Carolina Commons*, in that the Debtor's proposed plan "bears no resemblance to current commercial market conditions." *In re Carolina Commons Dev., LP*, No. 09-011230-8-JRL, 2010 WL 1965895, at *2 (Bankr. E.D.N.C. May 17, 2010). Ms. Marshall testified that there is no present "front end" real estate financing market in which such favorable terms would be available to the Debtor. Ms. Marshall also testified that there is no "exit financing" market in which such terms would be available to the Debtor. As such, proposed treatment of Wells Fargo's claim and the Debtor's proposed Plan are commercially unreasonable.

As in *In re EFH Grove Tower Associates*, 105 B.R. 310, 313 (Bankr.E.D.N.C. 1989), the Debtor's proposed Plan allows the Debtor to benefit from the Plan and places all associated risks upon Wells Fargo.  Under the Plan, Wells Fargo would assume all risks associated with non-payment.  No payments of any kind are required to be made to Wells Fargo during the eighteen (18) month period.  During this time, Wells Fargo risks the further decline in value of the collateral, the likelihood that the Real Property will not sell, while additional interest and fees accrue on the obligation.

Therefore, based on the specific facts and circumstances in this case, the Plan's treatment of the claim of Wells Fargo is not fair and equitable.  This finding does not mean a plan that proposes negative amortization is "per se" not fair and equitable. Plans proposing negative amortization with different circumstances and plan terms may be considered fair and equitable. However, this Plan treatment of Wells Fargo does not pass the fair and equitable test.

Accordingly, the Court holds that the Plan does not satisfy the requirements of § 1129. Therefore, confirmation of the Plan is **DENIED**.

     **SO ORDERED.**

**END OF DOCUMENT**
