**SO ORDERED.**

**SIGNED this 08 day of November, 2010.**

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:

THE NORTHERN OUTER BANKS     CHAPTER 11
ASSOCIATES, LLC,             CASE NO. 10-01292-8-RDD

      DEBTOR

## ORDER DETERMINING VALUE OF COLLATERAL

Pending before the Court is the Motion for Valuation of Collateral filed by Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association ("Wells Fargo") on June 23, 2010 (the "Motion") and the Response in Opposition to the Motion for Valuation of Collateral filed by The Northern Outer Banks Associates, LLC (the "Debtor") on July 13, 2010 (the "Response"). The Court conducted a hearing on the Motion and the Response on September 30, 2010 in New Bern, North Carolina and continued that hearing on October 7, 2010 in Wilson, North Carolina.

On February 19, 2010, the Debtor filed a voluntary petition for relief under Title 11 of Chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtor is a North Carolina limited

liability company and owns real estate consisting of approximately 5.35 acres of undeveloped property, located at 6195 Croatan Highway, Southern Shores, North Carolina (the "Real Property").

Wells Fargo is the holder of a promissory note in the principal amount of two million two hundred fifty thousand dollars ($2,250,000.00) executed on January 23, 2007 by both the Debtor and Bruce S. Pollak ("Mr. Pollak"), a managing member of the Debtor (the "Note"). As of the Petition Date, the balance due under the terms of the Note was $2,101,508.71, exclusive of attorneys' fees and costs. The parties do not dispute that the Note is in default.

In addition to executing the Note, the Debtor and Mr. Pollak executed a Deed of Trust granting Wells Fargo a first priority lien against the Real Property based on the indebtedness described in the Note.

At issue before the Court is the value of the collateral securing Wells Fargo's claim and a determination of Wells Fargo's secured status pursuant to 11 U.S.C. § 506(a)(1). Section 506(a) of the Code applies to Chapter 11 proceedings and governs the process of determining the value of an allowed secured claim. *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 957 (1997). "Under section 506(a), the value of property securing a secured creditor's claim 'shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.'" *In re Midway Partners*, 995 F.2d 490, 494 (4th Cir. 1993) (quoting 11 U.S.C. § 506(a)). As finders of fact, bankruptcy courts should determine the best method of ascertaining value, based upon the evidence presented. *Rash*, 520 U.S. at 964 n.6. Evidence presented may include, "appraisals, investment banker opinions, expert testimony, testimony of the parties, offers of purchase for the subject property, insurance policy coverage, trade journals and other published sources of prices, and less formalized evidence regarding prices obtained from the sale of similar property." 4 COLLIER ON BANKRUPTCY

¶ 506.03[9] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2009).  Furthermore, valuation should be determined "in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1).  Upon determination of the value of the collateral, the secured creditor's claim should be divided into secured and unsecured components since "[t]he secured portion of the claim [is] limited to the value of the collateral." *Rash*, 520 U.S. at 961 (citing *U.S. v. Ron Pair Enterprises, Inc.* 489 U.S. 235, 238-239 (1989)); 4 COLLIER ON BANKRUPTCY ¶ 506.02 [1][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 1996)).

At the hearing, the Court received evidence including appraisals, expert testimony, testimony of the parties, tax values, and sales of similar properties.  After considering this evidence and other factors, such as, the length of time the Real Property has been listed for sale, the undeveloped and unimproved state of the Real Property, the qualifications of the appraisers that testified at the hearings, the possible zoning restrictions on the Real Property, and the unfavorable economic climate and real estate market conditions, the Court finds the value of the Real Property to be one million nine hundred thousand ($1,900,000.00).

The evidence presented at the hearing shows that the Real Property is located in a seasonal resort area known as the Outer Banks.  The property consists of 5.35 acres, of which 4.55 acres are uplands and 0.80 acres of which are wetlands.  Additionally, about 0.80 acres of uplands are situated within a North Carolina power line easement which runs along the road frontage.  The property will share a waste water treatment plant with a patio home development east of the subject property.  However, in order to obtain working sewer access to the Real Property, sewer pipes would need to be installed.

The Debtor acquired the Real Property on July 21, 2003 for one million dollars ($1,000,000.00). Other than the bulkhead along the shoreline, the Real Property has not had any site improvements since its was purchased. The Debtor offered no evidence of available funds to improve or develop the Real Property by Debtor or members of the Debtor. Furthermore, the Real Property has been listed for sale since 2004. At the present time, the Real Property is an unimproved parcel of land with all approvals in place for a thirty-six (36) unit condominium project. As of January 1, 2005, the tax value of the Real Property was one million three hundred eighty seven thousand six hundred dollars ($1,387,600.00).

Both the Debtor and Wells Fargo presented expert appraisal testimony at the hearing. The Debtor presented the testimony of its appraiser, Quintin Bell ("Mr. Bell"). His appraisal report, dated June 15, 2010, values the Real Property at two million eight hundred forty five thousand dollars ($2,845,000.00). Mr. Bell was qualified as an expert and is a registered forester, a state-certified general appraiser and a licensed real estate broker. He has been appraising property for approximately forty (40) years. However, Mr. Bell is not certified by the Member Appraisal Institute ("MAI"). Mr. Bell devotes the majority of his practice to appraising large tracts and farmlands and his principle client is The Nature Conservancy of North Carolina. More specifically, Mr. Bell mainly appraises land that is destined for conservation ownership.

When questioned about his work, Mr. Bell stated that seventy-five percent (75%) of his appraisal work is focused on timberland and farmland, while the other twenty-five percent (25%) is devoted to appraising commercial or residential property. When asked how much of his work relates to commercial property, he stated "not very much." Mr. Bell stated he rarely does appraisals for lenders. Mr. Bell testified, that in his opinion, the highest and best use of the property is for commercial use, such as a restaurant such as a Cracker Barrel or International House of Pancakes.

4

Wells Fargo presented the testimony of its appraiser, Gregory L. Bourne ("Mr. Bourne"). The appraisal report of Mr. Bourne, dated September 25, 2010, valued the Real Property, as of September 25, 2010, at one million nine hundred ten thousand dollars ($1,910,000.00). Mr Bourne is a certified MAI appraiser and is also a state-certified general real estate appraiser. In addition, Mr. Bourne has over twenty-three (23) years of experience appraising property in eastern North Carolina.

Mr. Bourne stated that he primarily appraises commercial and residential development properties and has completed more than one thousand eight hundred (1,800) appraisals of complex properties. Furthermore, Mr. Bourne has previously appraised the Real Property eight times since 2004. In his opinion, he believes that the Real Property would require a marketing period of twenty-four (24) to thirty-six (36) months. He believes the liquidation value of the collateral – based on a sixty (60) to ninety (90) day marketing period – is one million three hundred thirty five thousand dollars ($1,335,000.00) as of September 25, 2010. Mr. Bourne qualifies his valuation by stating in his appraisal that "[t]he appraised values stated in this appraisal are based on current market data; however, in the past 12 to 24 months the Outer Banks Real Estate Market has experienced a significant slowdown which may impact future value levels." *See* Appraisal of Gregory L. Bourne, dated September 25, 2010, p. 2.

Mr. Bourne stated that in his opinion, the highest and best use of the property is a multi-family development project with thirty-six (36) condominium flats. He bases this opinion on the size of the lot, zoning, governmental approvals and location. Mr. Bourne testified that because of the weak demand for multi-family units, it is not financially feasible to develop the Real Property at the present time and the Real Property should be held for future development.

Mr. Bourne disagreed with Mr. Bell that the highest and best use of the property was commercial, because the Real Property is located in an area which experiences heavy traffic gridlocks, especially during the summer months. Furthermore, the Real Property would be difficult to access and, in Mr. Bourne's opinion, a traffic light could not be installed at this location to help with traffic flow and access.

Mr. Bourne testified that in today's economic climate and real estate market, to sell the Real Property in less than twelve (12) months would require a considerable price discount. The demand for residential condominiums has dramatically decreased over the past few years. Mr. Bourne testified he believed it would take nine (9) years to sell thirty-six (36) residential condominiums since it would take 2.37 years to absorb the existing inventory of condominiums that are currently on the market.

Both appraisers used the sales comparison approach in estimating the value of the Real Property. According to the appraisal prepared by Mr. Bourne, the sales comparison approach is a method which uses sales prices of whole properties similar to the subject property as a basis for estimating market value. The nature and condition of each sale are analyzed, making adjustments for dissimilar characteristics. This approach offers a good indication of value when a sufficient quantity and quality of sales exist in the marketplace. Both appraisers stated that real estate sales have been down significantly in Dare County and, since 2006, Dare County continues to experience significant declines in prices of lots and acreage.

While both appraisers have impressive credentials, and both relied on the sales comparison approach presented through appraisals to the Court, the Court finds the testimony of Mr. Bourne to be more persuasive. Mr. Bourne has experience appraising the type of real property at issue in this case, and has more experience appraising properties in Dare County. Furthermore, Mr. Bourne is MAI certified. Mr. Bell is not MAI certified and devotes most of his practice to appraising large tracts and

farmlands with a focus on conservation, not development.

As Mr. Bell stated, he rarely appraises the type of property at issue. While the Court realizes that valuation determinations in the bankruptcy context do not reach "mathematical certitude" and often appraisals involve "assumptions, predictions and to some extent speculation[,]" the Court finds the testimony of Mr. Bourne to be more reliable and persuasive. 4 COLLIER ON BANKRUPTCY ¶ 506.03[9] (Alan N. Resnick & Henry J Sommer eds., 15th ed. rev. 2009) (citing *Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941); *In re EFH Grove Tower Assocs.*, 105 B.R. 310, 314 (Bankr. E.D.N.C. 1989)).

Therefore, after considering the evidence of appraisals, expert testimony, testimony of the parties, tax values, sales of similar property, as well as other factors such as the time the Real Property has been actively listed on the market, the undeveloped and unimproved state of the collateral, the qualifications of the appraisers, the current economic climate and the state of the real estate market, the Court finds the value of the Real Property is one million nine hundred thousand dollars ($1,900,000.00).[1]

As a result of this valuation, Wells Fargo's claim is divided into secured and unsecured components. The secured portion of the claim is limited to one million nine hundred thousand dollars ($1,900,000.00), leaving Wells Fargo with an unsecured claim in the amount of two hundred one thousand five hundred eight dollars and seventy one cents ($201,508.71).

**SO ORDERED.**

**END OF DOCUMENT**

---

[1] The Court values the property at $10,000.00 less than Mr. Bourne's appraisal primarily because of the lack of any improvements to the subject property since purchase, and the Court's belief that real estate values on The Outer Banks are still in a state of decline rather than recovery.